IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

James Hose, on behalf of himself and all
other persons similarly situated,

               Plaintiff,


           vs.                           Case No. 13-2490-JTM


Henry Industries, Inc.,

               Defendants.


MEMORANDUM AND ORDER


Plaintiff James Hose works for Henry Industries, Inc., which coordinates with various pharmaceutical companies for delivery services. Hose has brought the present Fair Labor Standards Act (FLSA) claim on behalf of himself and other Henry drivers, alleging that the drivers are employers of Henry, that the routinely work in excess of 40 hours per week, but receive no overtime compensation. Henry contends that the drivers, some of whom are retained by intermediary contractors, are independent contractors rather than employees. The matter is before the court on the plaintiff's motion for conditional certification of the drivers as a class.

The FLSA was designed to guarantee fair compensation for employment. *Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 741 (1981). To further this goal, workers may

commence collective actions to gain fair compensation for overtime work. 29 U.S.C. § 216(b). The court administrates such collective actions to further "the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 172 (1989).

In the Tenth Circuit, courts consider FLSA class actions under a two-step approach. First, the court conditionally certifies the class, based on a modest factual showing that the class is similarly situated. Only during the second step, after the conduct of additional discovery, does the court decide whether to decertify the provisional class. It is at this second stage that the court considers "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether plaintiffs made the [proper] filings." *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001).

The court notes as an initial matter that much of the defendant's response to the motion for conditional certification appears relevant to the second stage of the certification inquiry, or even the ultimate merits of the plaintiff's FLSA claim. Thus, in nearly two dozen instances, the defendant disputes a factual allegation of the plaintiff as "controverted," citing some opposing evidence. In some of these instances, the defendant further asserts that the allegations of the plaintiff are "not properly supported by the record," because the underlying authority "is nothing more than his Second Amended Complaint." (Dkt. 54, at 7, 9).

This mistakes the standard applicable to first-stage, conditional certification. Conditional certification simply requires the presence of "substantial allegations that the putative class members were together the victims of a single decision, policy or plan." *Thiessen*, 267 F.3d at 1102. Whether there are in fact substantial allegations of a uniform plan or policy, "the court can consider *the substantial allegations of the complaint* along with any supporting affidavits or declarations." *Folger v. Medicalodges, Inc.*, 2014 WL 2885363, at *3 (D. Kan. June 25, 2014) (emphasis added, citing cases). In making the decision as to conditional certification, "the court does not weigh evidence, resolve factual disputes, or rule on the merits of plaintiffs' claims." *Id.*

Defendant further cites Judge Belot's decision in *Folger* to dispute the proposition that "the Court is not permitted to weigh the evidence at this stage in the litigation." (Dkt. 54, at 32 n. 10). But Judge Belot, as set forth above, most explicitly *agrees* with the proposition — the court does not weigh evidence.

The portions of *Folger* cited by Henry merely establish that, if substantial discovery has occurred, the court may consider the results of such discovery for the purposes of deciding whether a company-wide policy exists. 2014 WL 2885363 at *3. The court still does not weigh evidence, and still considers the allegations advanced in the complaint. *Id.* (citing *Swartz v. D-J Engineering*, No. 12-1029, 2013 WL 5348585, *5 (D.Kan. Sept. 24, 2013). *See also Barnwell v. Corrections Corp.*, No. 08-2151-JWL, 2008 WL 5157476, at *5 (D.Kan. Dec. 9, 2008); *Gieseke v. First Horizon Home Loan Corp.*, 408 F.Supp.2d 1164, 1166 (D.Kan.2006))).

Further, *Folger* reflects an unusual occurrence in FLSA certification cases. There,

3

most or all of the eleven opt-in plaintiffs supporting the claim of unpaid meal time had been deposed. Here, only limited discovery has occurred. There has been little or no discovery relating to the opt-in plaintiffs. The only deposition featured in the record before the court is that Brett Henry, the chief executive officer of the defendant.

The court finds that it may properly take into account both the allegations in the complaint and the evidence otherwise before the court. The court does not reach factual conclusions in the event of a factual controversy, and only determines the existence of a substantial allegation by the plaintiff.

Headquartered in Wichita, Kansas, Henry provides third party logistics services, warehousing services, and distribution services for clients with delivery needs. These clients, primarily pharmaceutical companies, are located throughout the nation. Henry operates through facilities in twenty five cities in eleven states.[1] Policies are implemented on a company-wide basis.

Henry stresses that, in addition to individual persons, it also contracts with corporations and limited liability companies, and that some of these contractors are not themselves drivers, but intermediaries who in turn engage the actual drivers.

Henry uniformly treats all of its drivers as independent contractors, regardless of

---

[1] Henry has facilities in Kansas (Hays, Salina, Topeka, and Parsons); Missouri (Florissant, Farmington, Springfield, Kansas City, Columbia, and St. Louis); Illinois (Belleville, Herrin, Quincy, and Springfield); Washington (Spokane and Seattle), Arizona (Phoenix and Tucson); Wisconsin (Pewaukee and Milwaukee); as well as California (Lodi); Iowa (Des Moines); Nebraska (Omaha); South Dakota (Sioux Falls); and Utah (Salt Lake City).

individual circumstances. The company gives all drivers a document addressing "Frequently Asked Questions" from independent contractors.

After the present action was filed, in October and November 2013, Henry held two-day training sessions on the classification of drivers as independent contractors. The sessions were intended to ensure that managers knew of the factors distinguishing independent contractors and employees. The classes, which included a mock question and answer session, were intended to apply to all drivers, regardless of location. Henry gave its managers a document highlighting best practices and "key rephrasing" of job duties. These training materials also indicate drivers are uniformly classified as independent contractors.

In its Response, Henry agrees that it uniformly considers all of its contractors to be independent contractors, not employees. It also agrees that it held a two-day training session for account managers to discuss the distinction between employees and independent contractors. However, it stresses that the training simply involved providing "neutral training materials used to demonstrate the distinction between an employee and independent contractor" (Dkt. 54, at 7).

Again, however, at this stage, the court does not address the validity of the training or how it affects the merits of plaintiff's FLSA claim. Indeed, the uniform training sessions are an indicator that Henry employed a uniform policy with respect to the drivers, and is therefore relevant to whether the drivers' positions are substantially similar.

Because Henry classifies all drivers as independent contractors, it does not pay

drivers extra for overtime.

Hose worked for Henry as a driver from April 15, 2013 until December 27, 2013.

Drivers routinely work in excess of 40 hours per week while performing duties for defendant.

Plaintiff alleges that the drivers were "titled ... as drivers," implying that the defendant used this term. The cited evidence — the deposition of Hose and the affidavits of the three opt-in plaintiffs — does not support the allegation. In Hose's deposition, he merely identifies the standard form Cartage Agreement he signed, which refers to him as "Contractor." The three affidavits all simply recite that affiant "worked as a delivery driver for Defendant Henry Industries" for a particular time period, without any indication that Henry titled or termed them as drivers.

The plaintiff alleges that the schedules imposed require the drivers to routinely work more than 40 hours a week. Some of the evidence cited by plaintiff does not support the allegation. That is, plaintiff cites the affidavits of Jones and Beard, but their affidavits only state that each individually routinely worked more than 40 per week; they make no representations about the schedules of other drivers.

However, the plaintiff relies also on his assertions to this effect in the Second Amended Complaint. As the court noted earlier, allegations in a complaint may properly be taken into account in deciding whether to approve conditional certification.

Evidence from the three opt-in driver plaintiffs indicates that drivers perform similar duties, using their personal vehicles to perform distribution and delivery services

6

for Hose's customers. Hose's further allegation that "[a]ll" drivers perform "identical" duties is not supported in the evidence.

Henry stresses that the actual services performed by the drivers differ, and may take the form of "line hauling" (carrying bulk freight), typical route deliveries based on a customer's schedule, and "stat" or special deliveries required by a customer.

Henry requires its contractors (whether drivers or contractors who in turn employ drivers) to sign a uniform Cartage Agreement. The cartage agreement contains twenty numbered sections, set forth in largely boilerplate terms, governing:

- Engagement of Contractor
- Services Covered
- Manner of Performance of Service
- Payments to Contractor
- Insurance
- Independent Contractor Status
- Indemnity;
- Financial Risk
- Confidentiality
- Non-Solicitation
- Remedies for Breach of Confidentiality or Non-Solicitation
- The One-Year Term of Agreement
- Governing Law
- Assignment of the Agreement
- Motor Vehicle and Criminal Record Release
- Drug Testing
- Waiver
- Notices
- Severability
- Compliance with Laws.

The Cartage Agreements differ in the Schedule A attached to each, which sets forth the

route and delivery services contracted for, along with payment information.

Henry maintains a uniform method for compensating drivers. Henry does not pay drivers on an hourly basis, and does not track their time. Drivers are paid by the stop, not by time spent driving. In some instances, actual pay rate may vary from one Cartage Agreement to another, and whether the service was stat delivery. Contractors must submit timely invoices for completed deliveries, and are prohibited from soliciting customers.

As noted earlier, the defendant frequently attacks suggested factual allegations as "controverted." At the same time, plaintiff frequently overstates what the actual, cited evidence does establish. Thus, the plaintiff alleges that Henry "uniformly tracks drivers' daily work performance and activities." The evidence cited for this claim, however, does not show that *Henry* actually tracks the drivers' progress on a daily basis or in real time. Rather, the evidence is simply that Henry's customers require tracking of their shipments (along with the DEA, since the deliveries involve pharmaceuticals).

To facilitate this tracking, some 80 percent of the drivers use an electronic tracking system called Xcelerator. This system tracks delivery times, the delivery address, the bar code, and the recipient's signature. Xcelerator records delivery times by capturing when the drivers scan the bar code and the recipient signs for the product.

Plaintiff alleges that Xcelerator gives Henry the ability to view a specific driver's location at any given time. The evidence does not support this allegation. The cited evidence establishes only that Henry, if it chose to do so, could view "the time at which [the drivers] were ... at each client's location." The evidence does not indicate that Henry can

8

or does monitor drivers along their routes or at other times.

The plaintiff alleges that "Defendant maintains tracking data generated by Xcelerator on a central server." Again, this misstates the evidence, which shows that Xcelerator is operated by a separate company, Key Soft. Henry and its customers can access the data on the Key Soft server. There is no evidence as to whether drivers are actually monitored on any substantial basis.

Plaintiff alleges that "Xcelerator ... provides drivers with the order of their daily route." Henry argues that this errs in suggesting that it controls the drivers' delivery routes, and fails to accurately reflect the evidence, which simply states that "*the customers* load their route schedules onto to the [Xcelerator] scanners," thereby determining the delivery order. If there is a stat delivery request, Henry dispatchers look at Xcelerator information to see which drivers are close. Drivers don't have to accept a stat request.

Some customers do not require Xcelerator tracking, and are satisfied with handwritten receipts.

Henry's pharmaceutical clients typically require drivers to arrive at a specific time, and make route deliveries in order. The plaintiff asserts that drivers face uniform delivery guidelines, but the evidence establishes only that Henry's clients set forth delivery schedules and guidelines, which Henry then communicates to the drivers. Henry contacts drivers to let them know if the client has additional goods for pick up or if a route needs to be changed. Under the Cartage Agreement, drivers must follow client route changes, but they are free to turn down stat requests.

The plaintiff alleges that Henry requires drivers to present a "uniform appearance." The cited evidence, the deposition testimony of Brett Henry, does not fully support this allegation. Henry specifically denied that the defendant requires drivers "to look a certain way." Drivers have been asked to maintain a certain level of personal hygiene, but this has occurred only after a customer has complained about a driver's appearance.

The plaintiff alleges that Henry "requires drivers wear uniforms bearing the Henry Industries logo." Mr. Henry did not testify to this effect. He testified that the requirement for some form of uniform is generated by the clients' contracts, because the clients expect proof of identification that the delivery is properly authorized. To provide this assurance, clients typically require some form of identification badge, and a shirt indicating the driver's status. Mr. Henry did *not* testify that all drivers wear shirts with the Henry logo. He testified that drivers may wear the Henry logo if directly contracted with Henry; if they work under an intermediary contractor, they can wear that company's logo on the shirt. Mr. Henry testified that the failure to comply with instructions as to appearance could result in termination of the Cartage Agreement, but this does not appear to have been a frequent occurrence, and appears to be at issue only where a client makes a complaint about a particular driver.

The plaintiff alleges that drivers must "provide and maintain their own personal vehicles for delivery and distribution." (Dkt. 43, at 9). This again somewhat overstates the evidence, which does not establish that all, or even most, drivers supply their own personal vehicles. Asked directly if a driver must supply "his own personal vehicle," Mr. Henry

agreed to (the rather obvious) fact that "[a] driver must have a vehicle to complete the routes." As noted earlier, some of Henry's contractors in turn contract with drivers, and there is no evidence about whether such drivers supply their own personal vehicles. It is uncontroverted that Henry does not have vehicles which it supplies to drivers.

The plaintiff alleges that Henry "establishes specific standards governing vehicle use." In fact, the evidence shows that Henry does not have any specific standards for drivers' vehicles, other than they are, in fact, able to carry out the required deliveries. The Cartage Agreements provide that drivers' vehicles have to be licensed and insured, and drivers must supply their own insurance. However, this does not appear to impose any burden in addition to that which all motorists face.

The plaintiff provides only a limited response to the defendant's evidence in opposition to conditional certification. The plaintiff does note, accurately, that courts generally afford little importance to the so-called "happy camper" affidavits of co-workers, offered by defendant. *See Chastain v. Cam*, No. 13-1802-SI, 2014 WL 3734368, *5 (D. Or. July 8, 2014) (happy camper affidavits not considered at the conditional certification stage). The plaintiff also urges the court to ignore all evidence submitted by the defendant on the grounds that he "has not yet had the opportunity to test the veracity of these statements through deposition testimony." (Dkt. 55, at 14).

As to the evidence from Mr. Henry, this is inaccurate. Counsel for the plaintiff deposed Mr. Henry, in detail, over two separate days in February, 2014, with over 500 pages of transcript resulting. Of the particular issues raised in Henry's affidavit, it appears

11

that plaintiff's counsel could and did make inquiry as to those subjects during the February depositions. For example, Henry asserts in response to the motion for conditional certification that it had no pre-set standard rate which it imposed for all deliveries, or even all routes, and that the requirement for the Xcelerator tracking system exists because its clients insist on it. (Dkt. 54, at p. 22 ¶ 15; p. 25 ¶ 27) ¶ 15).

At the same time, the evidentiary record before the court is far more limited than that presented in *Folger*. Most of the factual assertions in support of defendant's factual version of events comes not from Mr. Henry, but the affidavit of Breck Nickell, the defendant's President. (*Id*. at 20-23, ¶¶ 1-3, 6, 8-19, 16-17, 20-21, 25, 29-33). There is no indication that plaintiff has had the opportunity to test Nickell's assertions through discovery.

In addition to Judge Belot's decision in *Folger*, Henry relies on a number of decisions which have denied certification, but the relevance of these cases here is limited.

As noted earlier, *Folger* involved a relatively rare circumstance where the issue of conditional certification arose after intensive discovery, including the depositions of the opt-in plaintiffs. As the court stressed, their individual reasons for the lack of payment for meal period work were "all across the board." 2014 WL 2885363, at *4. Indeed, the depositions showed that in many instances the opt-in plaintiffs had in fact been paid for work during break time. Finally, the court stressed that the plaintiff's allegations arose from a very small sample of the two thousand employees of the defendant.

In reaching his decision to deny, without prejudice, conditional discovery, Judge

12

Belot also relied in part on *Saleen v. Waste Management*, 649 F.Supp.2d 937 (D. Minn. 2009) ("the Court is unaware of any court that has agreed with plaintiffs' position that evidence submitted by a defendant resisting conditional certification should be completely ignored"). In *Saleen*, the court denied conditional certification, although plaintiff had submitted 112 declarations of employees claiming to have been pressured to work through meal breaks. However, the defendant was a particularly large corporation and the declarations represented less than 1% of its work force. Further, defendant supplied evidence that in over 200,000 instances, it had in fact paid for work during meal time, which undercut the notion of a company-wide policy of requiring unpaid meal-time work, and other evidence suggested that some workers were not paid for meal-time work because of local decisions by individual managers, not a company wide policy. Ultimately, the court stressed that the issue was "a close one," and simply concluded that an earlier Magistrate Judge's decision denying conditional certification was not clearly erroneous.

In *Bamgbose v. Delta-T Group*, 684 F.Supp.2d 660 (E.D.Pa. 2010), the prospective class comprised some 11,000 contract workers employed by a temporary healthcare staffing agency, which acted through various affiliates across the country. The plaintiff argued that the workers were similarly situated because the agency had a uniform policy of treating all workers as independent contractors, stressing particularly that the affiliates used a common intranet, telephone and payment system, and that the agency's coordinators "determine which healthcare workers receive opportunities." 684 F.Supp.2d at 668.

The court held that conditional certification required more than the allegation of

uniform treatment:

> The Court must analyze whether the healthcare workers are similarly situated with respect to the analysis it would engage in to determine whether the workers are employees or independent contractors. The Court cannot only look to Delta–T's uniform classification of the workers or its common payment procedures, intranet, and telephone systems. Instead, it must determine whether the proof to demonstrate that the workers are "employees" or "independent contractors" can be applied to the class as a whole.

*Id.* at 668-69 (footnote and citations omitted).

After noting the relevant Third Circuit standard for the distinction between employees and independent contractors, the court concluded that the proposed classification could not be established through evidence obtained on a collective basis, given the wide disparity in the healthcare workers involved, who ranged from professionals with doctorates to those with only a high school diploma. *Id.* at 665. The evidence before the court suggested that the healthcare workers varied widely in (a) the degree of supervision imposed by the defendant, (b) the extent to which workers could negotiate their scheduled work, (c) the extent to which the agency's client acted as a joint employer, (d) whether workers could negotiate with clients for compensation, (e) the skills or training of the workers, and (e) the relative permanence of the work relationship. The court found only one of the relevant factors supported through common evidence (the fact that the staffing of healthcare workers was integral to the defendant's business). However, the court concluded, conditional certification "cannot be maintained when the class appears similarly situated with respect to only one factor." *Id.* at 671.

14

*Pfaahler v. Consultants for Architects, Inc.*, No. 99-C-6700, 2000 WL 198888 (N.D. Ill. 2000) was not decided under a conditional certification analysis.

*In re FedEx Ground Package System Employment Practices Litig'n*, 662 F.Supp.2d 1069 (N.D. Ind. 2009) provides little help here. The decision there to deny conditional certification of the FLSA claim of the prospective class of drivers was focused on the court's determination that the named plaintiff was not an adequate representative of the prospective class.

After an extensive discussion of that issue, the court observed, "[m]oreover," that conditional certification "must take into consideration the actual history of the parties' relationship, necessitating an individualized examination of the multiple factors relating to each driver's employment." 662 F.Supp.2d at 1083. This conclusion was based on two cases, *Pfaahler* and *Reich v. Hornier Distribution*, 362 F.Supp.2d 1009, 1013-14 (N.D. Ind. 2005). As the court previously noted, *Pfaahler* was not decided under a conditional certification standard. *Reich* was decided at the conditional certification stage, but its conclusion — that the plaintiff class was not similarly situated similarly where "liability depend[s] on an individual determination of each employee's duties" — is directly contrary to Tenth Circuit precedent. *See Thiessen v. General Electric Capital*, 267 F.3d 1095, 1102-03 (10th Cir. 2001) (the "disparate factual and employment settings of the individual plaintiffs" is reserved for the second, decertification step).

The plaintiff in *Chemi v. Champion Mortgage*, No.05-1238, 2006 WL 7353427 (D.N.J. June 21, 2006) sought to certify a class of loan officers, and alleged that the defendant

improperly classified the officers as exempt to avoid the payment of overtime. The court first concluded that a bare assertion of misclassification was insufficient, since this would render certification essentially automatic in all cases. 2006 WL 7353427 at *4 (citing cases). Other than this conclusory assertion, the claim for certification was strikingly absent in specifics, the court stressing that

> plaintiffs have failed to make any initial showing in either their opening brief or their reply, that supports a determination that putative class members are similarly situated as to job requirements or pay provisions. Indeed, in their initial brief, plaintiffs failed to submit a single affidavit in support of its motion, instead relying entirely on the pleadings and conclusory allegations in its brief. Numerous courts have found such allegations insufficient to satisfy the burden of demonstrating the similarly situated standard.

*Id.* at *5. The court then required supplemental briefing, and was again met with a complete failure to supply anything other than "conclusory, bare bones facts" assertions. *Id.* at *6.

The cases cited by Henry are distinguishable. Unlike *Chemi*, the plaintiff here has fleshed out his allegations in the Complaint with specific allegations of the duties imposed on the drivers, and the rough similarity of the defendant's relationship to those drivers. The plaintiff has done more than simply allege a misclassification exists. Unlike *Bamgbose,* the prospective class does not appear to vary widely in terms of its education and training.

Two recent cases involving the employment status of temporary drivers provide support for conditional certification.

In *Holliday v. J.S. Express*, No. 12-1732-ERW, 2013 WL 2395333 (E.D Mo. May 30, 2013), the court granted conditional certification of a class of over 1200 courier drivers operating in 13 states. As in the present case, the named plaintiffs in *Holliday* alleged that,

16

while defendant classified them as independent contractors, they were actually employees. Specifically, the plaintiffs alleged that defendant required drivers wear uniforms, carry cellphones, and forced them to pay for their own fuel, insurance, and automotive presence.

*Holliday* is distinct in that the plaintiffs grounded their motion for conditional certification on the findings of a Department of Labor investigative report relating to the defendant, and much of the opinion is devoted to the defendant's argument that the DOL report was inadmissible hearsay. The court held that the report was admissible as a public record, and that the drivers were similarly situated for certification purposes. The court also rejected the contention that certification should be denied because of the individualized nature of each driver. As in the present case, the defendant argued that there were significant differences in the duties of each driver, and that the drivers "work in different states, in different industries, and for different ... clients with distinct demands." 2013 WL 2395333, at *6. The court nevertheless held that conditional certification was appropriate:

> As noted earlier, the first stage of certification requires nothing more than substantial allegations that putative class members were together the victims of a single decision, policy or plan. The Court need not make a credibility determination with respect to contradictory evidence presented by Defendant at this stage. Defendant's argument that there is no feasible way to adjudicate due to the necessity of individual inquiries is premature. Manageability is an issue for the second stage of the conditional certification analysis.

*Id.* (citing *Arnold v. DirecTv, Inc.*, No. 4:10CV352 JAR, 2012 WL 4480723, at *7 (E.D.Mo. Sept. 28, 2012)).

Notably, although *Holliday* is prominently featured in the plaintiff's Memorandum in Support of conditional certification (Dkt. 43, at 5 n. 2, 14, 15-17, 19), the defendant does not mention the case in its Response. While there is no DOL report as to Henry's employment practices, the plaintiff has still provided substantial allegations that Henry's drivers are similarly situated for purposes of the FLSA case.

In *Pena v. Handy Wash*, ___ F.Supp.2d ___, 2014 WL 2884559, *9 (S.D. Fla. June 18, 2014), the court approved conditional certification of a class of drivers employed by a company providing patient transportation services. Because the services were not emergency ambulance services, the drivers were not highly paid, and the defendant uniformly treated all drivers as independent contractors. The court stressed that it did not address the merits of plaintiff's claim that the defendant misclassified the drivers as contractors, only that the drivers were similarly situated and individual differences as to the drivers' routes, rates, or vehicle ownership were insufficient to defeat conditional certification. With respect to the nature of the driver class, the court observed that the standard required the similar, not identical positions. 2014 WL 2884559, at *6-7 (citing also *Gipson v. Southwestern Bell Telephone*, No. 08-2017-EFM, 2009 WL 1044941, at *3 (D.Kan. Apr. 20, 2009) ("Variations among actual job title or some responsibilities does not preclude notice stage certification where all employees share general duties and the defendant denies overtime pay to all")

As to the existence of individualized differences among the drivers, the court found that these concerns were insufficient to prevent conditional certification:

18

Defendants oversee the manner in which the drivers' work is performed and ensure drivers comply with the Policy Manual and the requirements of the Paratransit Contract, which required Zuni to monitor performance levels and standards of conduct for drivers, and ensure compliance with mandatory standardized training and minimum requirements for vehicles. Independent contractor drivers lacked control over assignments and did not exercise discretion or make management decisions, instead following dispatch assignments provided by Defendants. Although drivers were required to complete certain basic training, the position did not require any special skills. As discussed, Defendants provided the opt-in plaintiffs with vehicles, automobile insurance, and a Nextel phone to communicate with dispatchers. The extent the independent contractor drivers' services were an integral part of Defendants' business is unclear as Defendants also have employee drivers responsible for routes. But Defendants clearly rely on drivers to provide paratransit service to clients in Miami-Dade County.

Admittedly, several of the economic realities factors will require a more individualized analysis, including the degree of permanency and duration of the working relationship, facts specific to each driver. The dates of employment for Peña and the opt-in plaintiffs differ. Additionally, Defendants assert some independent contractor drivers, such as Ramirez-Valandia, were incorporated, while others worked in their individual capacities. Whether potential plaintiffs were incorporated or had the ability to employ others to accomplish their duties may also require an individualized assessment. Ramirez-Valandia's independent contractor agreement is between Handy Wash and Hugo's Driver Corp., and Ramirez-Valandia identifies himself as the president of Hugo's Driver Corp. Nonetheless, the issue of incorporation is not cause to deny certification at the notice stage. Of the opt-in Plaintiffs, there is only evidence Ramirez-Valandia was incorporated. Whether other opt-in plaintiffs were incorporated may be considered at the second-tier inquiry. Peña and the opt-in plaintiffs are similarly situated even considering the economic realities of their employment. Defendants may raise the issue of the fact-intensive nature of any class treatment on a motion to decertify, after discovery has concluded.

*Id.* at *11 (record citations omitted). *See also Singleton v. B&H Transportation*, No. No 13-0882, 2014 WL 1572983 (E.D. Wis. April 17, 2014) (granting conditional certification of driver class, where defendants gave drivers their passenger pickup schedules, corroborating

19

affidavits indicated that drivers worked in excess of 40 hours per week, and defendant's evidence of a lack of a uniform policy was equivocal); *Spellman v. American Eagle Express*, No. 2011 WL 4102301 (E.D. Pa. May 18, 2011) (same result, based on driver averments that "they worked or work as a courier for AEX under AEX's close direction, supervision, and control [and] each frequently worked more than forty hours per week" without overtime payment).

The court finds that conditional certification is appropriate. While Henry stresses that individual drivers undertook different types of delivery (regular route deliveries, line hauling, and stat deliveries), it is not clear how much of each type of work the drivers generally performed. While such considerations may affect the second-stage decertification analysis, they are not controlling here. More importantly, precise identity of situations is not required. All of the types of delivery cited by defendant are, in the end, driving. There is no indication that Henry's drivers are substantially different in terms of skills or training. While some unknown number of drivers contract with Henry indirectly through intermediaries, this does not justify denial of conditional certification. Rather, after additional discovery, the matter may be relevant to decertification or the creation of an additional subclass.

Similarly, the defendant's insistence that is the pharmaceutical *customers* who create the routes or schedules for the drivers, and that it is the *customers* who insist drivers wear uniforms, is insufficient to defeat conditional certification. It would be remarkable indeed to suggest that the defendant imposed requirements out of sheer caprice. Businesses exist

to satisfy customers. Henry's factual argument ultimately may have relevance to the merits of plaintiff's FLSA claim. If pharmaceutical companies indeed demand electronic tracking and the wearing of uniforms, this would affect the "economic realities" of the relationship of the parties. *See Baker v. Flint Engineering & Construction*, 137 F.3d 1436, 1440-41 (10th Cir. 1998) (discussing the definition of "employees" under the FLSA).

But at the conditional certification stage, the court does not address the merits of the plaintiff's claim. Indeed, if anything, the defendant's argument serves to support certification. Since Henry's customers require drivers to conform to certain requirements as a part of their industry generally, there is every reason to believe that Henry drivers in California face the same general requirements as those in Missouri.

The plaintiff has presented substantial allegations that the prospective class is similarly situated, and that it is subject to a uniform policy of treating all drivers as independent contractors. The drivers are employed under a standard form Cartage Agreement. There are substantial allegations that they must provide their own vehicles, and follow routes which require more than 40 hours per week to complete. The defendant maintains a uniform method for compensating drivers, although individual pay rates may vary. Most drivers carry electronic tracking devices and are required to submit timely invoices. Drivers are prohibited from independently negotiating with customers for additional delivery services. The court finds that conditional certification is warranted.

The defendant presents two alternative arguments, in the event the court grants plaintiff's motion. First, the defendant suggests that any proposed class be limited to

drivers operating out of Henry's Florissant, Missouri facility, on the grounds that plaintiff and the three opt-in plaintiffs only have personal knowledge of that facility. Second, the defendant proposes to modify the proposed class notice in three respects: (1) it wishes to limit notice to Florissant drivers, (2) it argues the notice should be modified to add a warning that opt-in plaintiffs may be subject to a countersuit for indemnification, and (3) the court should strike the notice's reference to a three-year statute of limitations, which only applies in the event of willful violations of FLSA.

The court finds that the conditional certification should not be limited to Florissant. The four District of Kansas cases cited by Henry in support of this result all turn upon the specific circumstances involved, and are not directly relevant here. In *Hobbs v. Tandem Environmental Solutions*, No. 10-1204-KHV, 2011 WL 484194, at *2 (D. Kan. Feb. 7, 2011), the court limited the class to one branch of the defendant in light of the fact that "plaintiffs make no allegations of company-wide policies or practices." In *Braun v. Superior Indus. Int'l, Inc.*, No. 09-2560-JWL, 2010 WL 3879498, at *6 (D. Kan. Sept. 28, 2010), the court stressed that "there are no allegations or evidence from which the court could infer that employees in those facilities are required to perform pre-and post-shift work." In *Pegues v. Carecentrix, Inc.*, No. 12-2484-CM, 2013 WL 1896994, at *3 (D. Kan. May 6, 2013), the court stressed that plaintiff's allegations, based on a single email sent before the effective rollout of a payroll system "are insufficient to establish any level of company-wide policy"). Finally, in *Blancarte v. Provider Plus, Inc.*, No. 11-2567-JAR-KGG, 2012 WL 4442642, at *3 (D. Kan. Sept. 26, 2012), the court noted that "[p]laintiff does not name a single co-worker who shares his

22

concerns, or one willing to provide an affidavit or desire to opt-in to the litigation."

Of course, in the present case, plaintiff makes precisely such allegations of a company-wide, uniform policy, and offers just such evidence of additional workers who wish to opt-in. In *Braun*, the plaintiffs argued that they were not paid for work performed before and after their official shift. Their evidence, however, related to one facility only, and the court recognized that such additional work might well have been caused by the decisions of "a handful of 'rogue' supervisors" in plaintiff's local facility. Here, the plaintiff's allegations relate to a company-wide policy in how Henry treats its drivers. The drivers are employed pursuant to a standard form Cartage Agreement. All of the evidence presented to the court *from both sides* indicates that the decision to treat drivers as independent contractors is a company-wide policy.

As noted earlier, Henry offers various justifications, such as the demands of customers, for the conditions faced by the drivers. Such rationales again may be relevant to the second stage in the process, or may serve to defeat plaintiff's FLSA claim on the merits. But such justifications are company-wide considerations. Despite the opportunity to present extensive evidence from its corporate officers, Henry has done nothing to indicate that its treatment of drivers is one thing in Seattle and something else in Phoenix.

The court therefore declines to modify the proposed class, and declines to modify the proposed class to reflect such a geographic limitation. In addition, the court denies the request to modify the proposed class notice to issue a warning that opt-in plaintiffs may be subject to a counterclaim for indemnification.

Plaintiff cites two cases to support its warning suggestion. In both *Dobbins v. Scriptfleet, Inc.*, No. 11-1923-T, 2012 WL 2282560 (M.D. Fla. June 18, 2012) and *Spellman v. American Eagle Express*, 680 F.Supp.2d 188, 190 (D.D.C. 2010), the courts denied motions to dismiss the defendants' indemnification counterclaims. In each instance, the counterclaim was advanced only *against the named plaintiff*s (and, in *Dobbins*, her attorneys). Neither case was before the court for certification, and neither addressed the content of the conditional class notice. Nothing in either opinion suggests the court would approve such a warning to opt-in plaintiffs. Whether the defendant might ultimately be entitled to indemnification is an entirely separately question from whether warnings should be included in the class notice. Thus, while prevailing defendants in federal civil litigation are generally entitled to an award of costs, courts typically refuse requests to include a warning of possible costs in a class notice. *See, e.g., Williams v. U.S. Bank Nat. Ass'n*, 290 F.R.D. 600, 613 (E.D. Cal. 2013) (noting chilling effect of such notice); *Martinez v. Cargill Meat Solutions*, 265 F.R.D. 490, 500 (Neb. 2009); *Littlefield v. Dealer Warranty Services*, 679 F.Supp.2d 1014, 1019 (E.D. Mo. 2010). Given the absence of any relevant authority, and the broad and remedial purpose underlying the FLSA, the court declines to include the proposed warning.

Finally, the court declines to include a provision in the notice as to the shorter statute of limitations period applicable to non-willful violations of the FLSA. Such notice would require an explication of "willfulness" which might be confusing to the ordinary layperson. More importantly, willfulness "go[es] to the merits of the case and not whether notice should be issued to potential claimants." *Resendiz-Ramirez v. P & H Forestry*, 515 F.Supp.2d

937, 942 (W.D.Ark.2007). *See also Regan v. City of Charleston*, No.13-3046-PMD, 2014 WL 3530135, at *4 (D.S.C. July 16, 2014); *Ott v. Publix Super Mkts.* No. 12-0486, 2013 WL 1874258, at *3 (M.D.Tenn. May 3, 2013); *Sylvester v. Wintrust Fin. Corp.*, No. 12-01899, 2013 WL 5433593, at *5 (N.D.Ill. Sept.30, 2013) (even a "conclusory willfulness allegation is sufficient to justify providing notice to the putative class on the basis of the potentially applicable three-year period"); *White v. 14501 Mancheser, Inc.*, 2012 WL 5994263, at *7 (E.D. Mo. Nov. 30, 2012) (conditionally certifying three year-class on grounds of judicial economy).

IT IS ACCORDINGLY ORDERED this 24th day of September, 2014, that the plaintiff's Motion for Conditional Certification (Dkt. 42) is hereby granted.

 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

25